And our last case for argument this morning is Carbon Crest, LLC v. Tencue Productions, LLC Hi, Lynn Hunt for Carbon Crest, and I'd like to reserve eight minutes for rebuttal. The District Court committed several legal errors en route to reluctantly invalidating the agreement error. The straightest path to reversal requires the Court to address just two of them. First, as to licensing, on these facts, California's interest is not so materially greater than Delaware's that it justifies setting aside the party's choice of Delaware law. Second, on the corporate issue, Wilk's disinterested approval of the agreement, exercising the Turning to the licensing issue, Tencue fails to pass any of the three gates necessary for it to avoid its own choice of Delaware law. The Court need find only one gate closed to reverse. I'd like to start at the last one, whether California's interest is materially greater than Delaware's. On the facts of this case, no. If the California licensing statute applies on these circumstances at all, which we separately dispute, it is at the farthest reaches of that statute and far from its heartland for three reasons. Geography, the nature of the services, and other guardrails that protect California's policy interests in its licensing scheme. So starting with geography, at the time the parties went into this contract, they knew it was going to be a multi-state transaction. They contemplated that Lewis would perform his services from New York. But beyond just the fact that you might think of Lewis as a remote worker from New York, to the extent a multi-state corporate transaction like this has a locus, it was outside California. As the District Court held and found, I'm sorry, no negotiations took place in California. To the extent Lewis participated in negotiations, he did not do so in California. Nine out of the ten roadshows were outside California. The accounting firm was outside California. The locus of this transaction, as well as Lewis's services, simply did not fall within the state. I mean, of course, you're not talking about the key fact that this whole transaction was about the sale of a business and the sale of the business is in California. So, I mean, it seems a stretch to say that California doesn't have a pretty significant interest in this transaction. Well, Your Honor, I'd say the interest is minimal, not just for geography, but also due to the nature of services, which were, and I'll return to sort of the fact that 10Q is a California business in a bit, but in addition, because the nature of the services encompassed far more than negotiations or something that would fall within the broker remit. In addition, because even the negotiations themselves relate to this sort of multi-state corporate transaction, which is far from the heartland of the California real estate licensing statute. But turning to just the mere fact that 10Q is a California business, I don't think that makes California's interest significant. I mean, I think you can look at Consul, this Court's decision, which has already said if the real estate transaction involving real property in California, that alone is not enough to trigger within this state. And I think that's still binding law for this Court. But I think even if you look at Burbrower, which is the California Supreme Court's decision on what it means to practice law within the state, the Supreme Court said clearly, even when you're talking about the land of remote work, someone doesn't practice law within California just because they opine on California law anywhere, or even for a California client. They said what you're looking for is a California client and a California case, and practicing California law. And so I think this transaction is not, although the ultimate transaction that is consummated is the sale of 10Q, this contract itself is for assisting with that sale. And that sale, again, to the extent it has a location, is not California. None of the prospective buyers were from California. None of the work performed under the agreement, with the exception of two in-person meetings, was performed in California. And those, we would say, fall outside. Would you agree, in absence of the governing law clause, that California law would apply? Actually, we don't agree with that, Your Honor. What law would apply, leaving aside the fact that the governing law clause? We actually believe New York law would apply, and that's because when you look at the factors, the five factors that the restatement in the California courts have adopted that you look at, place of performance is one of them. And the restatement explains you need to examine the significance of those contacts with respect to the issue at hand, and the issue at hand is, were these services lawful? And so the jurisdiction that has the most interest in deciding what regulation applies to those services is the jurisdiction where they're performed, which was New York. And so we think, and we cited cases including Edgington, that when you're dealing with a services contract, that's the most important circumstance, and that would dictate New York law. So we think the 10-Q fails to pass that gate, but even if you disagree with us on that, and you say that California law would otherwise apply, at the end of the day, California's interest in regulating at the far reaches of the statute is minimal, and Delaware has a significant interest here. And just to talk about the other side of that balance, it's not just the freedom of contract, although that is important, and in Guardian savings, that alone was enough to validate the party's choice of Texas law, but it's also that Delaware has an interest in its using Delaware law as a corporate lingua franca for multi-state transactions. And this is precisely why we have choice of law clauses, which California has a strong public policy favoring. So the California policy here is not solely its licensing interest, but also it's favoring the ability of parties to choose law that gives certainty to their interactions, particularly when they're going to occur multi-state, cross-border. And so that's what we have here. A transaction that fundamentally occurs outside of California, with the sole connection to California being that the services are being performed for a California client, which was not enough in consul to put the services within the state. We think it's not enough here, but even if it's close, it shows that California's interest is lesser and outweighed by Delaware's. I think you said earlier that the parties anticipated at the outset that the work was going to mostly be done in New York. My understanding of the record is that Mr. Lewis didn't move to New York for well over a year after entering into this agreement. So I need you to help me on that point. Yes, Your Honor. So there's two different agreements. One is the business advisory agreement, which is not at issue in this case. That's not being invalidated here. And at the time that Lewis entered into that agreement, he was living in California. He entered into that as an individual. He signed it as individual. He actually moved to New York at the beginning of 2016, and the sales process advisory agreement, which is the agreement at issue here, was not signed until the end of July 2017. So he'd been working from New York for a year and a half at that point. So certainly everyone at 10Q understood that he would continue working from New York. The parties contemplated he would be in New York. But the purpose of that agreement was, as stated, to represent the company in potential sales transactions, correct? Yes, Your Honor. That was the goal of that agreement. The sales process, yes, was to assist 10Q with the sale. Was that the singular goal of that agreement? I think assisting 10Q with the sale was a singular goal of that agreement, but assisting with a transaction of that kind does not—just assisting with a sale transaction, no matter what you do in connection to that transaction, is not an unlawful objective. And I think you can see that most clearly in the Venturi case, which we discussed mostly in our severability analysis. But if you look at the contract there, the person agreed to do a lot of different things with respect to a property transaction, and the court says some of those were broker things, some of them were not. So just assisting with a sale is not sort of an impermissible objective, but that was the objective of the contract. So to get to—I just want to add to the—not only did the parties contemplate that Lewis would be working from New York, but in the SPAA itself, they discussed that Lewis would arrange for a banking partner. That banking partner was AdMedia, who conducted the front line of negotiations and was based in New York. And to get to another reason why California's interest is lesser here, there are other guardrails on these circumstances that protect California's policy interests, and one of them is the participation of AdMedia. Wilk actually changed the AdMedia contract to specify that California law applied to that contract, and AdMedia is the one that was conducting the front line of negotiations as the district court found, to the extent there was any sort of need for certification of ability in these kinds of transactions, that kind of interest is protected by AdMedia. In addition, as the district court found, Lewis was competent, and he wasn't—he didn't go out there and offer his services to the California public, 10Q asked him to help. I want to turn to the corporate issue, and on that issue, our main condition, and we think the straightest path to reversal, is that Wilk exercised the delegated authority of the board, and his disinterested approval justifies that agreement. Under Delaware law, it's clear that that sort of authority can be delegated to either a single director or to management. We think, in fact, it was delegated here, and you can see that, both from the district court's findings on 10Q standard practice, as well as the email that the COO sent around to all members of the board, saying Wilk and Lewis would be having a separate conversation about this. And then, it was negotiated between Wilk and Lewis for two months, and Wilk—you know, Lewis did not participate in approving this agreement on 10Q's behalf in any way. The negotiation was, you know, solely between him and Wilk, representing 10Q's interests as a fully disinterested party, and so under Godina and Toedman, we believe that suffices under Delaware law, and Godina, in particular, involved a delegation that was both express to a compensation committee, but the court said it's not quite clear that that committee had the full authority, so there was also an implicit delegation in there, given that delegate's position in the company, and that applies to Wilk, as well, given the company's standard practice of delegating all major decisions to Wilk to make them. So, those are the only—those two issues, the only two issues we think the court need to address to reverse, but there are, of course, other pathways to reversal here, and unless there are further questions at this time, I'll resume the remainder of my time for rebuttal. Just one question. Yes. You mentioned that contracts can have several other objectives, and I went through the contract. I'm trying to find what those other objectives were. What were the other objectives that you can point to? Well, I think the two key ones are evaluating other buyers. I think you can—you actually look at the task level, so I'll start there. I think if you compare to the Venturi contract, which we think is our best case on this, Venturi, like, laid out six tasks. Our contract lays out six tasks, and the court there—that was the California Court of Appeals—looked task by task, and so I think the two tasks that focus on here that were permissible assistance to a sale were evaluating potential buyers and managing the process, and managing the process is, in fact, the key thing that Wilk testified Lewis did, but I would also add to this that even the object of assisting with a 10-Q from the sale from New York is not itself an unlawful object. The parties were not contemplating that Lewis would engage in any broker services within the state of California, and engaging in broker services in connection with a sale from New York is, under the geographic limit of California statute, not an unlawful objective itself. I'll reserve the remainder of my time. Good morning. My name is Sheldon Eisenberg, and I represent the appellees and the cross-appellants. I want to jump to the chase on the insurmountable problem for reversing the district court's finding that the SPAA is not enforceable. The district court found that the fee structure of the SPAA was, quote, excessive and unfair to 10-Q, close quote. And that is actually the best thing that you can say about the SPAA. The fee structure that Carbon Crest, Mr. Lewis, got Mr. Wilk to sign off on was over 300% more than the highest priced, best licensed investment banker would have charged to 10-Q in connection with this transaction. And that was the only evidence on the subject in the case. And the SPAA contained this three-year tail provision that was also three times more than the usual provision for a licensed investment banker. As a result of that factual finding on unfairness and excessiveness, the district court actually found that Carbon Crest and Mr. Lewis breached their fiduciary duty of loyalty to 10-Q by seeking and obtaining that agreement. The reason why this is the beginning and the end of that agreement is that both California and Delaware, you don't even have to struggle with the choice of law issue, both of them hold under California's terminology that an interested director agreement has to be just and reasonable. And under Delaware's terminology, an interested director agreement has to be fair to the corporation or to the entity. And when I refer to fairness for Delaware law as the standard, I do need to point out that appellant's citation to the Marciano case in its reply brief is actually citing a case that's now been abrogated, as stated by Westlaw. The problem for relying on Marciano for the point that maybe business judgment is actually the right standard is explained in a Delaware case entitled Cook v. Uli, O-O-L-I-E, and the citation is 1997 W-L-3-6-7-0-3-4 at pages 8 and 9. And I'll just briefly quote it because we obviously did not respond to the reply brief. Quote, both parties fail to recognize that the Delaware Supreme Court has since Marciano and Rosenberg were decided more fully develop the standard by which this court should judge a board's actions when it engages in a transaction with one or more of its own directors. And then on page 9 of that opinion, the Cook opinion then goes on to say, quote, compliance with Section 144 shifts the burden to the plaintiffs, to demonstrate that the transaction was unfair. So the law that we relied on, the Fliegler case and then the Zimmerman case, it cited Flieger approvingly in 2012, are the prevailing law in Delaware. The transaction has to be fair even if all the procedural hurdles of Section 144 were satisfied, and we clearly do not believe they were satisfied in this case. So given the district court finding there, I do not believe there's any way that appellant can demonstrate that the SPAA is enforceable. Let me just touch on a couple of the other problems with the informal approval arguments made by appellants in this case. One, they assert that there's implied ratification that took place here. They rely heavily on a Tenth Circuit case decided in 1987, which relied on Delaware law that did not actually involve an interested director contract. But 30 years after that Tenth Circuit case, speculating on what Delaware law might be, with respect to an interested director case, we have the Espinoza v. Zuckerberg case, which very, very clearly rejects any concept of common law ratification with respect to issues of corporate governance, especially when they're addressed specifically by Delaware statute. But the argument that applies to both Delaware and California, regardless of which law applies, that I just wanted to highlight, was that assuming this was a kind of agreement that could be ratified, the ratification would require that the ratifier, the respondent here, would have to have known of their right to void the agreement. The quote from the Fergus case, California, that we cite is, it is an inherent element of ratification that the party to be charged with it must have fully known what he was doing. The very essence, either of an election or ratification, is that it is done advisedly with full knowledge of the party's rights. There is absolutely no evidence that at any time anybody at 10Q, certainly not Mr. Wilk, but most certainly not the other directors and not the other 50% shareholder, ever knew that they had a right to disavow this agreement. And why would they? They weren't lawyers. And they weren't seeking legal advice on the subject. In footnote 6 of Appellant's reply brief, they cite to evidence that Mr. Wilk at one point had gone and consulted with a lawyer. It doesn't say about what, by the way, but he had consulted with a lawyer. But there's also clearly no evidence that that consultation led to any knowledge that Mr. Wilk had a right to disavow this agreement. And again, certainly zero evidence whatsoever, from which you could even draw an inference that the other directors or the other shareholder had such knowledge of a right to disavow that would have made a ratification appropriate. The delegation issue also leads to just one more point about the reply brief that I wanted to call to the Court's attention if it hadn't focused on it. And that is, I mean, the law that everybody agrees on is that the authority to delegate either in California or Delaware is not unlimited. Instead, it's allowed for management of day-to-day-type functions, including executive compensation. What CarbonCrest tries to do in its reply brief is to call Mr. Lewis a company executive. And CarbonCrest actually puts the word executive into quotes. And it cites page 4 of the district court's opinion for that proposition. It's ER7 in their excerpts of record. And when you look at that page, there's not a mention of that. There's not a mention that Mr. Lewis was an executive of the company. He was a third party. The SPAA itself says he's an independent contractor, and it specifically disclaims any sort of employment relationship between Mr. Lewis and 10Q. So there is no way, besides all the other issues with delegation, including the fact that there wasn't one, and I won't go through our briefing on that, but even assuming there was an attempt at a delegation, that kind of issue could not have been delegated because it's not part of the day-to-day operation. Indeed, a contract for the sale of a company and hiring somebody to assist you or handle that sale of the company, that's the opposite of day-to-day management of a company. On the licensing issue, I don't think there could be much doubt that the licensing requirement represented in the brokerage statute represents a fundamental policy of the state of California. The statutory scheme itself checks all the boxes for what constitutes the fundamental policy under the cases. It makes the contracts illegal and void, prohibits the unlicensed party from even bringing an action for any compensation whatsoever. It imposes criminal penalties on unlicensed persons. Is that contract severable? No, because it only had one distinct object, and so California statute says that it's not severable, and even if it were severable, Judge Mendoza, what do we do with that when there's zero evidence of how much time is spent on an activity that's not covered by the brokerage statute? But there's clearly only one object to that, and as Mr. Lewis testified, and it's in the record, his job under the SBAA was to negotiate, negotiate, negotiate. That is the heart, the core of brokerage activity. Counsel pointed out that it's to evaluate other buyers, for example, to manage the process, for example. Those are among two that she mentioned. And that's what brokers and investment bankers do. They manage the sales process. Mr. Smith testified to that in terms of what it is you're hiring somebody to do. So it's all part of assisting in the sale of the business. So in terms of Davis-Moreno, the case we cited, written by Judge Wenger in the Eastern District of California, goes through this exact fundamental policy analysis with respect to the contractor statute in California, Business and Professions Code 731. I think that's a very good template for the analysis to determine that this very parallel provision in Section 10.1.3.0 of the Business and Professions Code would follow. And I would just point out Section 70.31, the contractor licensing statute that Judge Wenger applied in Davis v. Moreno, has the same structure in terms of its language as does 10.1.36. It says, no one without a license shall bring a claim for any compensation. And if that statute, if 731, with the same structure as 10.1.3.6, if that statute that requires licensing for contractors, which includes house painters and plumbers, if that's a fundamental policy of the State of California, as I think Davis-Moreno correctly finds, then certainly it's a fundamental policy to regulate and ensure licensure of people that are going to not just paint your house, but actually sell your house, probably your biggest investment if you're an individual, and most certainly if that person who's supposed to be licensed is going to sell your business. So I think it's pretty clear it's a fundamental policy, and as a result the District Court was correct in finding that California law should apply to that. And as a result, the failure of a license precludes the enforcement of a contract. Let me go to our cross-appeal in closing, unless there's any questions about that. With respect to the cross-appeal, first I want to respectfully address the Court in its role as being the managers and guardians of the predictability and the stability of the Law of the Ninth Circuit in California, which is obviously here. Letting the District Court award to Carbon Crest for Guantanamo, unjust enrichment, quasi-contract, however it was framed, cannot be left to stand as citable authority on West's law, which it is right now. It will create extraordinary doctrinal confusion in this circuit and on California law. The doctrine that a court cannot resort to perceived equitable considerations to justify an award to somebody on a void contract is so well and firmly established in California that the court in the All Points Traders case actually reached out and invalidated an arbitral award, where we know, as the Court well knows, arbitral awards are respected even if there are errors in law. But this violation of the principle, the Court in All Points Traders found, exceeded the arbitrator's power. That principle about not resorting to equitable considerations has been around since at least 1957. I can tell you with relatively good confidence that that's 65 years ago or so. Besides wreaking havoc with that whole body of law about not reaching out to perceived equitable considerations, it would also wreak havoc with the principle under the Maglica case about how do you actually determine how much to award in a quantum merit quasi-contract situation. And Maglica, the California court, was very clear in saying you don't do it by considering the so-called benefit that was provided to the defendant. You do it by actually looking at the value of the services. And looking at the contract, as Maglica says, is a very different thing than looking at the value of the services rendered under the contract. And in this case, as the Court knows from looking at just the district court opinion, the only thing the district court looked at was the price paid under its blended formula formulation. Both of those elements looked at the price paid to 10-Q upon its ultimate sale to the Opus agency. That is the definition of benefit received as opposed to value of service rendered by CarbonCrest. But besides doing the right thing from the standpoint of managing the law in this circuit, I think the Court can take a lot of comfort in also believing that it will have done the equitable thing in reversing that million-and-a-half-dollar reward. Plaintiff's approach in this lawsuit was to absolutely swing for the fences. It never mentioned quantum Merowit or this theory. It was in its complaint, very cursory plead. But it never mentioned that theory or that claim in its opening statement, in its closing statement, in the testimony of Mr. Lewis, or even in its proposed findings of fact and conclusions of law. As we discussed in our brief, you don't even need to get to the legal issue because we think under Ninth Circuit authority that was an abandonment of the claim. But when Plaintiff struck out, instead of hitting the home run that Plaintiff was hoping for, there just was no proper legal way for the trial court to step in and try to make some sort of compromise award here, which is what I think happened, and which not... well, perhaps coincidentally, but it very much resembled the pre-litigation settlement offer that 10Q had made, and that was admitted by the district court over our objection. A good reminder of the wisdom of the underlying policy that civil litigators take for granted, that you shouldn't let triers of fact see settlement offers because it can influence their decisions. But affirming the award here would require the court to recognize some new exception to existing law on when someone can circumvent what has, for years and decades, been the absolute prohibition on receiving compensation on a void contract. And I would just say in closing that Mr. Lewis and Carbon Crest are not the parties for whom this court should go out of its way to try to craft this exception. Carbon Crest was well compensated during its work with 10Q over $700,000 for part-time service over a period of five years. And it was also the entity that the district court found breached its fiduciary duty of loyalty in trying to extract what the expert, the only expert witness in the case, called an outrageously high fee in the SPAA. And with that, I would ask the court to affirm the district court's refusal to enforce the SPAA and reverse the district court's award of $1.5 million in quasi-contract. Thank you, counsel, for your helpful argument. Thank you very much. I'd like to start with severability. I think what's most instructive there is, as I mentioned, the Venturi case, and you can see it quoted in the yellow brief of page 44. And in that case, the court went task by task under the same statute, the same broker licensing statute, instead doing things like preparing information materials and due diligence on potential financing sources were not broker-required tasks. They may be things that brokers often do, but they're not tasks for which a license is required, and that's very much like Carmen Kress evaluating potential buyers here, just as managing the sale process is similar to formulating a marketing strategy, which was at issue at Venturi. So I think this contract had several objects, and some of them were not broker tasks. Stepping back from that, the licensing statute, even if it is fundamental, that is not enough to void the party's choice of law clause. It is important to consider on these precise facts how strong California's interest is. And the fact that this agreement covered numerous services that weren't broker services, and that even the district court found the negotiations that took place were outside of California, really reduces the amount of California's interest. The primary objection that my friend on the other side has to the contract that he started with is that the fee structure is excessive. That is not relevant to the question of whether or not the contract is voidable under Delaware law. I will have to check the Cook v. Uli case that he cited. I'm not familiar with that case, but I believe if you read Marciano and the cases that follow, including the Zuckerberg case, which I'll get to in a minute, that counsel relies upon, which says that if you do have that kind of approval, it makes the contract no longer voidable without consideration of fairness. And you can see this in Toedman as well. You'll find that on the void or voidable issue, Delaware law is, if the board of directors, through its delegee or otherwise, here, Wilk, approve the contract, then the wisdom of that contract is up to the board or the board's delegee. And the only thing the courts will then invalidate that contract on is waste. It is a separate question as to whether or not an executive or a director still breaches its fiduciary duty of loyalty if, for example, shareholders bring a derivative suit and they are seeking to impose damages for a breach of fiduciary duty by the directors. That may not be, like, the board's buy-off in that contract may not be the end-all, be-all. You may still need to prove fairness. And I think if you go all the way back to Flegler and the cases that the other side relies on, you'll see that's what they're talking about. Here, the district court held 10Q was not damaged by the breach of loyalty. It awarded no damages on that, and that was not part of their cross-appeal. So I think that question of intrinsic fairness is not one the court needs to reach if it finds, as it should, that the corporate issue is governed by Delaware law. And I think that's clear in Toedtman, which was precisely on all fours with this case. Turning to ratification, I think that's an alternative way that this contract can be upheld. And 10Q's argument is that they were not aware of all the material facts. But you can start in February of 2019 when the entire contract was made available to every member of the board as well as the shareholders. And in May of that year, 10Q, in an email at 770, described the agreement as the agreement that's currently in place. That is as unambiguous as you get that even after 10Q was fully aware of the contract, it did not repudiate it and, in fact, continued to act as if it was in place. So we think that qualifies as ratification as a backup to our delegation argument. Last, on the cross-appeal, I would direct the court's attention to MKB management. This ironclad rule that 10Q believes exists, that there can be no quantum merit damages when a broker is unlicensed and sues for compensation is simply not the law in California. And in MKB management, the court first discussed severability and said we're going to send it back for consideration of whether or not the contract is severable. The court then turned to the quantum merit claims and said, even if the entire contract was illegal and unenforceable, a plaintiff may recover reasonable value of services rendered, provided that those services were not legally prohibited. So those are two distinct issues. MKB management clearly accepts for the broker licensing statute that quantum merit damages are available. And the district court, that's what the district court awarded here. The district court considered 10Q's arguments on abandonment, which 10Q squarely put before the district court. And I'll be the first to stand up here and admit that our post-trial conclusions were not a model of clarity on this point. But the district court said, no, they're still talking about unjust enrichment. They've used confusing labels, but they've preserved the claim, and I'm going to rule on it. Balanced the equities, which the district court was in the best position to judge, and awarded an equitable remedy using defendant's own evidence of the reasonable value of the services, which is completely permissible under California law. Step back in terms of who's the most wrong party here. I think that is obviously not the issue in front of the court. We submit that the district court found it was Lewis, but the point here is that when we're talking about the licensing statute, it's far out of our fringes, and those are difficult questions to answer. That's precisely why the parties choose to adopt a choice of law clause. And when you're dealing with a closely held corporation where corporate informality is its standard operating procedure and the board repeatedly lets one individual make all of the important decisions, that factors, too, that when you follow those processes and you negotiate for two months and you reach a contract, that you're entitled to rely on the way the board has operated to date. We think the law upholds both of those principles, and there's no reason to set aside the parties' choice of law clause to reach out after 10Q agreed to Delaware law and impose a California licensing requirement that we think doesn't even apply, but if it does, it is only at the farthest fringes, to invalidate the contract and hold that Carbon Crest can take no compensation. So we would ask that you reverse the district court invalidation of the contract, but if you're not inclined to do that, that you affirm its award of equitable damages. Thank you, counsel. The matter of Carbon Crest LLC versus 10Q Productions LLC is submitted. We appreciate counsel's helpful arguments in this case and all the cases on the docket this morning, and we are concluded for the day. Thank you. All rise.
judges: THOMAS, FORREST, MENDOZA